**Sandra J. DEINLEIN, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**Linda M. BUCK, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**Karl Klaus BOLLE, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**Julia CONCEPCION, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**Nos. 11738, 11815, 11504 and 11732.**

District of Columbia Court of Appeals.

Argued Nov. 17, 1977.

Decided April 11, 1978.

---

Michael R. Murphey, Washington, D. C., for appellants Deinlein and Buck.

Charles T. Taylor, for appellants Bolle and Concepcion.

Margaret L. Hines, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellee. Louis

P. Robbins, Principal Deputy Corp. Counsel, Washington, D. C., was also on the brief for appellee in No. 11815.

Before NEWMAN, Chief Judge, KERN, Associate Judge, and HOOD, Chief Judge, Retired.

NEWMAN, Chief Judge:

Appellants Sandra J. Deinlein, Linda M. Buck, and Julia Concepcion were separately convicted after trial each of administering a cross-sexual massage on the premises of duly licensed massage establishments in violation of D.C.Code 1973, § 47–2311. Appellant Karl K. Bolle was convicted of aiding and abetting the administration of a cross-sexual massage in a licensed massage parlor in violation of the same D.C.Code provision. Appellants seek reversal primarily on the ground that § 47–2311 is unconstitutionally vague and ambiguous, both on its face and as applied to them, and thus contravenes their Fifth Amendment rights to due process of law.[1] We affirm.

## I

At appellant Bolle's trial, the following evidence was stipulated. Appellant Bolle held himself out as manager of the Sweetheart Health Spa, a licensed massage parlor located at 5123 Georgia Avenue, N. W. On April 15, 1976, two female masseuses employed at the parlor, one of whom was later arrested, administered massages to two male undercover police officers. Appellant Bolle was present on the premises during the administration of the massages. When

---

1. Appellant Bolle also alleges that the District of Columbia failed to provide him with reasonable prior notice of enforcement of § 47–2311, thereby violating his Fifth Amendment due process rights. On the day before the events giving rise to Mr. Bolle's conviction occurred, the Metropolitan Police Department Public Information Branch had publicized through the local television media and the press that the police were going to resume enforcement of § 47–2311, pursuant to this court's reversal of a Superior Court ruling which had invalidated the statute as a denial of the constitutional guarantee of equal protection of the law. *See Cullinane v. Geisha House, Inc.,* D.C.App., 354

A.2d 515 (1976). Appellant Bolle alleges that the general public notice procedures employed by the D.C. Government were insufficient to apprise him of the law and that the only effective method of notice, under the circumstances, would have been personal notice to every individual who might have been affected by the renewed enforcement of the statute, or at least to all massage parlor operators.

In addition to attacking the constitutional validity of their convictions under § 47–2311, appellants also challenge the sufficiency of the evidence to support their convictions. We find no merit in any of these contentions.

the officers paid the masseuses the fee for the massages in marked Metropolitan Police Department (MPD) funds, they transferred the money to appellant. Mr. Bolle then used some of the money to make personal purchases at a nearby liquor store. Upon his return to the parlor, appellant was arrested. The money which was recovered from him was the same money which had been paid to the masseuses by the officers for the massages.

The following facts were developed at the trial of appellant Deinlein. On the night of April 29, 1976, two male undercover police officers went to the Cat's Pajamas, a licensed massage parlor at 4617 41st, St., N.W., to investigate complaints which had been received about the establishment. Appellant Deinlein approached one of them in the parlor's reception area and asked him if he wanted the twenty dollar "regular" massage, which consisted of a full-body massage by a topless hostess. The officer assented, and they went to an upstairs room. He gave Ms. Deinlein $20 of marked MPD funds which she then delivered to her boss.

Upon her return, appellant directed the officer to undress while she disrobed. He undressed down to his briefs. Appellant, nude, then began to "massage" the officer's chest—i. e., "she put her hands on [his] chest, rubbing [his] chest." Record at 12. After fifteen to twenty seconds, the officer arrested the appellant for massaging a member of the opposite sex in contravention of § 47–2311.

Testifying on her own behalf, Ms. Deinlein denied telling the officer that she would give him a massage; she stated that she explicitly told him cross-sexual massages were prohibited in the District. She further stated that she explained that he could purchase the $20 "regular" "encounter session" provided at the parlor, which consisted of a hostess, clothed in a body suit, dancing or talking or doing exercises with a nude customer. The officer made sexual overtures toward her, propositioned her, and finally arrested her when she rebuffed his advances, she asserted.

The evidence at the trial of appellant Buck disclosed that on September 14, 1976, another male undercover police officer went to the Cat's Pajamas massage parlor. Appellant Buck approached the officer and quoted the price list of the various massages offered at the parlor. He selected the thirty dollar "combination" massage, which consisted of a nude hostess and nude customer "rub[bing] each other down." Record at 6. After the officer paid her $30 in marked MPD funds, they went to an upstairs massage room. They both completely disrobed. Appellant Buck then "massaged" the officer's legs, thighs, back, and shoulders, and chest and stomach with talcum powder—i. e., "she ran her hands and fingers over [his] body, [his] muscle areas." Record at 7. After approximately five minutes of this, the officer arrested Ms. Buck.

Appellant Buck testified that when the officer requested a massage from her, she explained that the parlor only offered "encounter sessions," not massages, and that the thirty dollar "combination" only entailed the performance of exercises with the customer. He then requested sexual favors, she stated, to which she replied that she could only put some powder on his back before they did their exercises. While in the upstairs room, she sprinkled powder on his back, his shoulders, and his legs. For less than two minutes, she stated, she merely "took [her] hand, like a slap, to puff the powder up into a form of smoke." Record at 34.

The evidence presented during appellant Concepcion's trial consisted of testimony that on the night of September 23, 1976, two male undercover police officers went to the Coquette Health Spa, a licensed massage parlor located at 1633 Connecticut Avenue, N.W., and requested massages. Appellant Concepcion greeted him in the waiting room and described the "massage exercises" offered at the parlor. One of the officers gave her five marked MPD ten dollar bills in payment for a one-hour "nude exercise," in which the hostess "massaged" the customer or the customer "massaged" the hostess.

Appellant and the officer went to another room where they disrobed. While the officer lay face down on a massage table, appellant Concepcion sprinkled powder on his back, and for approximately three or four minutes "massaged" him—*i. e.,* "rubb[ed] . . . up and down" his back and shoulders. Record at 10. She was then placed under arrest.

Appellant Concepcion denied that she ever engaged in any physical contact with the officer. After the officer lay on the table, and before she could get undressed, she stated, he arrested her for operating a massage parlor without a license.

II

Section 47–2311 provides in pertinent part:

It shall be unlawful for any female to give or administer massage treatment or any bath to any person of the male sex, or for any person of the male sex to give or administer massage treatment or any bath to any person of the female sex, in

any establishment licensed under this section. Any person violating the provisions of this section shall, upon conviction, be punished as hereinafter provided in this chapter; and, in addition to such penalty, it shall be the duty of the Commissioner of the District of Columbia to revoke the license of the owner or manager of the establishment wherein the provisions of this section shall have been violated.[7]

Appellants contend that this statutory provision is unconstitutionally vague on its face and as applied to their conduct. Focusing on the language "to give or administer [a] massage treatment," they argue that the statute is so inherently vague and ambiguous as to the activity to which it refers that the average person cannot reasonably be expected to comprehend what conduct is therein prohibited. They assert that the term "massage" is properly defined in the manner set forth in other state statutes which contain comprehensive definitions of the term, such as the Florida and New York massage statutes.[3] The manifest ambiguity

---

**2.** Punishment for Violation of § 47–2311 is imprisonment for not more than ninety days or a fine of not more than $300. D.C.Code 1973, § 47–2347.

Although a subsequent amendment has increased the licensing fee required by the statute, the provision challenged herein remains unaltered. *See* D.C.Code 1977 Supp., § 47–2311.

**3.** The Florida statute in pertinent part reads as follows:

(1) MASSEUR AND MASSEUSE.—

(a) For the purpose of this chapter the term "masseur" or "masseuse" shall be deemed to be a person who practices, administers or teaches all or any one or more of the following subjects and methods of treatments, viz: who administers or teaches treatments with any mechanical or electrical apparatus for the purpose of body slenderizing, body reducing or body contouring.

(b) Further, a person who has studied the underlying principles of anatomy and physiology, including the theory of massage, its indications and contraindications, and administers or teaches all or any one or more of the following subjects and methods of treatments, viz: Oil rubs, salt glows, hot or cold-packs, all kinds of baths including steam-rooms, cabinet baths, sitz baths, colon irrigations, body massage either by hand or by any mechanical or electrical apparatus or device,

excluding fever therapy, applying such movements as *stroking,* friction, rolling, vibration, *kneading,* cupping, petrissage, *rubbing,* effleurage, tapotement.

\* \* \* \* \* \*

(4) MASSAGE.—For the purpose of this chapter, the term "massage" shall be deemed and held to include all or any one or more of the above named subjects or methods of treatments as defined in paragraph (b) of subsection (1); the practice of massage, however, shall include paragraphs (a) and (b) of subsection (1). [Fla.Stat. § 480.01(1), (4) (1975).]

The relevant New York statutory definition similarly provides:

The practice of massage as a licensed masseur or licensed masseuse is defined as engaging, under such title, in applying a scientific system of activity to the muscular structure of the human body by means of *stroking, kneading,* tapping and vibrating with the hands or vibrators for the purpose of improving muscle tone and circulation. [N.Y.Educ.Law § 7801 (McKinney 1972).]

Each of these specific provisions is part of a comprehensive licensing scheme for the regulation of massage parlors through the establishment of minimal educational and training standards in these states. *See* Fla.Stat. § 480.01 *et seq.* (1975) and N.Y.Educ.Law § 7800 *et seq.* (McKinney 1972).

of § 47–2311 becomes even more apparent, they maintain, when it is contrasted with such statutory provisions, for neither § 47–2311 nor any other D.C.Code section provides any definition of "massage treatment."

Appellants further argue that the deficiency alleged in § 47–2311 can only be remedied by a restrictive construction of "massage treatment" which conforms to the detailed definitions of that term set forth in the Florida or New York statutes. *See* note 3, *supra.* As properly construed in this manner, they claim that § 47–2311's prohibition could apply only to cross-sexual physical contact in licensed massage parlors for hygienic or other health purposes—conduct basically different from that in which they engaged. Otherwise the term "massage" could be interpreted to apply to almost any type of behavior in a licensed establishment which involves physical contact between members of the opposite sex, thus making it impossible for ordinary citizens to distinguish between what is permitted and what is prohibited under the law.

It is axiomatic in our system of law that a penal statute "must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties," and "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 79 L.Ed. 322 (1926) (citations omitted). "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes," *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 (1939); "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954) (footnote omitted). Thus, if a stat-

ute establishes legal standards of conduct so indefinite that the general public cannot reasonably be expected to comprehend its content, and judges and jurors must determine what constitutes illegal behavior on an ad hoc basis, it must be invalidated as violative of the fundamental tenets of the Fifth Amendment Due Process Clause. *Giaccio v. Pennsylvania,* 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966) (14th Amendment Due Process Clause); *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921); *Ricks v. United States,* 134 U.S.App.D.C. 215, 414 F.2d 1111 (1968).

Applying these legal standards to § 47–2311, we conclude that the statute, examined on its face, as well as in light of the facts surrounding appellants' offenses, *United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 46 L.Ed.2d 228 (1975) (citation omitted); *United States v. National Dairy Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963), comports with the basic due process standards of definiteness and sufficiency of notice as to the proscribed conduct. The word "massage" is not so obscure a term in the standard English lexicon that it can fairly be said that many ordinary persons are ignorant of or confounded as to its meaning when confronted with it. To the contrary, "massage" has a very definite meaning in common and ordinary usage which is familiar to the vast majority of English-speaking individuals.

"Massage" has been very simply defined in one standard English dictionary as the "act or art of treating the body by *rubbing, kneading,* or the like, to stimulate circulation, increase suppleness, etc." [4], and as the "manipulation of tissues (as by *rubbing, stroking, kneading,* or tapping) with the hand or an instrument for remedial or hygienic purposes" [5] in another. Additionally, "massage" has been defined by a well-known legal reference as "a method of treating the superficial soft parts of the body for remedial or hygienic purposes, con-

---

4. The American College Dictionary 749 (1970) (emphasis added).

5. Webster's New Collegiate Dictionary 707 (1977) (emphasis added).

sisting in *rubbing, stroking, kneading,* tapping, etc., with the hand or an instrument; a *rubbing* and *kneading* of the body." [6] It is apparent from the similarity of these definitions that the word "massage" has a generally acknowledged definition.

Appellants' contention that the average citizen of ordinary intelligence in our society has not assimilated the common meaning accorded to the term into the course of his everyday vocabulary and experience thus strains credibility to the breaking point. We reject their assertion that § 47–2311 does not provide the ordinary citizen fair and adequate notice that the action of *rubbing, kneading,* or *stroking*—the essence of the term "massage"—*by a member of one sex* of various parts of the body *of a member of the opposite sex* (whether with one's hands or other instruments) is prohibited on the premises of licensed massage parlors.

We hold that the statutory language of § 47–2311 here challenged provides, within limits sufficiently discernible for judges and juries fairly to administer the law in accordance with the legislative intent, adequate notice of what conduct falls within its proscription. *Connally v. General Construction Co., supra.*

■ Since the term "massage" has a universally accepted definition in our society, the usage of "massage" alone, without further explication in the statute, is sufficient in our view to convey the meaning intended by § 47–2311's anti-cross-sexual massage provision. We are unpersuaded by appellants' assertion that § 47–2311 must fall because Congress failed to include a

detailed definition of the term "massage" similar to that provided in other state statutes. The Constitution does not erect "impossible" standards of linguistic precision in statutory formulations, *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947); "no more than a reasonable degree of certainty [is] demanded" of the legislature. *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952). "The fact that Congress might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." *United States v. Powell, supra,* 423 U.S. at 94, 96 S.Ct. at 321 (citation omitted). We note that the detailed language defining "massage" which appears in the Florida and New York statutes adds little to the commonly accepted meaning of the term. *See* notes 3–6, *supra.*[7]

■ Finally, we reject appellants' argument that the evidence of their violations of the statutes is "marginal"—*i. e.,* that their conduct falls beyond the outer reaches of § 47–2311's prohibition—because no ordinary person would reasonably perceive that this anti-massage statute forbade the brief body contact which constituted appellants' encounters. Appellants' assertion proves too much, for § 47–2311 does not prohibit all massages performed in licensed massage parlors, or all types of interpersonal contact between individuals in general or between individuals of the opposite sex in such parlors. It merely prohibits the administration

---

**6.** 55 C.J.S. *Massage* (1948) (emphasis added). *See also Garaci v. City of Memphis,* 379 F.Supp. 1393, 1398 (W.D.Tenn.1974) (quoting C.J.S. definition).

**7.** We also reject appellants' proffered distinction as to the types of cross-sexual massages that are prohibited by § 47–2311. Neither the language itself, which is clear on its face, nor the legislative history of the statute suggests that Congress intended to prohibit only remedial cross-sexual massages, leaving untouched those performed for other purposes. (In fact, the legislative history of § 47–2311 makes no reference, explanatory or otherwise, to the ban on cross-sexual massages incorporated into the

statute.) *See* H.R.Rep. No. 1385, 72d Cong., 1st Sess. (1932); S.Rep. No. 867, 72d Cong., 1st Sess. (1932); 75 Cong.Rec. 12871, 14336 (1932). We infer from the Congress' usage of the general term "massage treatment" that it intended to outlaw all cross-sexual massages—for whatever purpose—in these establishments. The statute as written thus represents a policy judgment well within the province of legislative discretion, and we cannot substitute a different judgment for that apparently adopted by the legislature in the absence of some suggestion, either in the statutory language or the legislative history, to that effect.

of all *cross-sexual* massages. Based on the facts as found by the trial courts, we think the evidence clearly established that appellants' activity is precisely the conduct that falls within the boundaries of § 47–2311's proscription, even though appellants may not have engaged in such activity for substantial periods of time. The statutory infraction was complete after the prohibited conduct commenced—no matter what the duration of such conduct thereafter.

 Even if appellants' offenses could be viewed in any sense as only marginal, our finding as to the constitutional validity of § 47–2311 would remain unaffected. "[D]ifficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. . . . The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Jordan v. De George,* 341 U.S. 223, 231–32, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951), *citing United States v. Wurzbach,* 280 U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508 (1930). *See United States v. Petrillo, supra,* 332 U.S. at 7, 67 S.Ct. 1538. Furthermore, "[it is not] unfair to require that one who deliberately goes perilously close to an area of proscribed conduct [as appellants did] shall take the risk that he may cross the line." *Boyce Motor Lines, Inc. v. United States, supra,* 342 U.S. at 340, 72 S.Ct. at 331 (footnote omitted).

*Affirmed.*